## DEPARTMENT OF PROFESSIONAL REGULATION, DIVISION OF REAL ESTATE v ALFERT and TOLEDO REALTY, INC.

Case No. 87-3189

State of Florida, Division of Administrative Hearings

December 7, 1987

### APPEARANCES OF COUNSEL

**Arthur R. Shell, Jr.** for petitioner.

**Harold M. Braxton** for respondent.

### OPINION OF THE COURT

DONALD R. ALEXANDER, Hearing Officer.

### *RECOMMENDED ORDER*

Pursuant to notice, the above matter was heard before the Division of Administrative Hearings by its duly designated Hearing Officer, Donald R. Alexander, on October 27, 1987 in Miami, Florida.

### *BACKGROUND*

By an administrative complaint filed on June 24, 1987 petitioner,

Department of Professional Regulation, Division of Real Estate, has charged that respondents, Ramiro J. Alfert and Toledo Realty, Inc., licensed as a real estate broker and corporate broker, respectively, had violated Subsection 475.25(1)(b), Florida Statutes (1985).[1] With a somewhat complicated factual underpinning, the complaint generally alleged that in March, 1985 two salesmen for respondents' firm solicited and obtained a sales offer on certain residential property in Miami, Florida, that the prospective buyer gave the salesmen a $4,000 deposit which was placed in respondents' escrow account, that after the sale failed to close the buyer agreed to allow respondents to retain the deposit to be used on a future transaction, that the two salesmen later submitted a second, albeit fraudulent, offer on another property, and that during this period of time respondents failed to supervise the salesmen's activities and to later discipline them for their alleged improprieties. The complaint charges respondents with being guilty of fraud, misrepresentation, concealment, false promises, dishonest dealing by trick, scheme or device, culpable negligence and breach of trust in a business transaction and with having violated a duty imposed upon them by law as proscribed by Subsection 475.25(1)(b), Florida Statutes (1985).

Respondents disputed the above allegations and requested a formal hearing pursuant to Subsection 120.57(2), Florida Statutes (Supp. 1986). The matter was referred by petitioner to the Division of Administrative Hearings on August 4, 1987 with a request that a hearing officer be assigned to conduct a formal hearing. By notice of hearing dated August 17, 1987, and by mutual agreement of the parties, the final hearing was scheduled on October 27, 1987, in Miami, Florida.

At final hearing petitioner presented the testimony of Marie J. Pardo, Carlos Cachaldora, Paul F. Buechele and Arlene Futrell. It also offered petitioner's exhibits 1 and 2. Both were received into evidence. Respondent Alfert testified on his own behalf and presented the testimony of William Monk. Respondents also offered respondents' exhibits 1-5. All were received into evidence.

The transcript of hearing was filed on November 16, 1987. Proposed findings of fact and conclusions of law were filed by respondents on November 23, 1987. None were filed by petitioner. A ruling on each proposed finding is made in the Appendix attached to this Recommended Order.

---

[1] The complaint named four licensees as respondents in this cause. However, only two have requested a hearing.

As narrowed by counsel at the outset of final hearing, the issue is whether respondents' licenses as real estate brokers should be disciplined for culpable negligence and breach of trust in a business transaction as more fully described in the administrative complaint.

Based upon all of the evidence, the following findings of fact are determined:

### FINDINGS OF FACT

1. At all times relevant hereto, respondent, Toledo Realty, Inc. (TRI), was a corporation registered as a real estate broker having been issued license number 0133053 by petitioner, Department of Professional Regulation, Division of Real Estate (Division or petitioner). Respondent, Ramiro J. Alfert, holds real estate broker license number 0223005 also issued by petitioner. Alfert, who has been a broker for eleven years, was licensed and operating as a qualifying broker and officer for TRI when the events herein occurred. The firm is located at 7175 Southwest 8th Street, Suite 210, Miami, Florida.

2. Approximately three years ago, the Federal National Mortgage Association (FNMA) began foreclosing on a number of residential properties on which the owners had defaulted. Wishing to dispose of these repossessed properties in an expedited manner, FNMA selected at random a number of brokers in the Miami area who were given exclusive listings and agreed to advertise the properties, and take such other steps as were necessary to make a quick sale. Futrell Realty (Futrell) in Kendall, Florida was one such broker, and it had the exclusive listing on the two properties relevant to this proceeding. According to established FNMA procedure, a broker who obtained an offer on a FNMA property was obliged to send the original contract to the listing broker who then mailed it to FNMA area headquarters in Atlanta, Georgia.

3. Marie J. Pardo was a salesperson for TRI, having worked there for almost six years. Pardo represented two potential buyers, Lazara Rouco and Artemia Delgado, an unmarried couple, who were interested in purchasing a FNMA property at 794 Southwest 97th Court Circle, Miami. On March 19, 1986 Pardo prepared a purchase/sales contract on behalf of Rouco and Delgado in which the couple offered to buy the property for $65,000. A $4,000 deposit was given by Rouco to Pardo and then placed in TRI's trust account. In accordance with established procedure, the original contract was sent to Futrell which forwarded it by express mail to FNMA in Atlanta.

4. Four days after the contract was executed, Pardo was advised by

Rouco that she and her boyfriend had separated, and she could no longer afford such an expensive house. But by now, the offer had been accepted by FNMA, and Rouco's $4,000 deposit was at risk. In an effort to save Rouco's deposit, Pardo, with FNMA's approval, secured another buyer for the property, and had Rouco assign the contract to the new buyer. The house was thereafter sold by FNMA to the new purchaser on an undisclosed date. Pardo did not advise Alfert or other TRI personnel that this action had been taken.

5. Knowing that Rouco still wished to buy a home, but one that was less expensive, Pardo obtained Rouco's agreement for TRI to retain the $4,000 deposit pending efforts to find another property. In June or July, Pardo located another FNMA property at 100 Southwest 110th Avenue, unit 138, Miami. Because Pardo considered Rouco to be a credit risk, Pardo decided to have Rouco prequalify for a loan before a formal contract was submitted to FNMA. Accordingly, Pardo obtained (presumably from TRI files) another FNMA contract executed on June 10, 1986 by three buyers (Julio Ugarto, and Patricia and Ernesto Duarte) on a different FNMA property. She made a copy of that contract, scratched out the existing names, address and price, and inserted a new price ($47,500), address and Rouco's name. The altered contract was dated July 10, 1986. Although Pardo showed Alfert a copy of the contract that day, he did not notice anything unusual about it, and sent a letter to the mortgage company confirming that TRI had an escrow deposit of $4,000. Pardo stated she did not disclose the alterations to Alfert since she feared being fired if respondents learned of her actions.

6. Pardo sent a copy of the altered contract to a mortgage broker friend to see if Rouco could qualify for a loan. Before she heard from the lender, Pardo left Miami in early September for a three-week vacation in the Dominican Republic. She asked another salesman with whom she shared a desk, Carlos Cachaldora, to hold the contract while she was gone. Cachaldora was a long-time employee of TRI, having worked there for some twelve or thirteen years. The two had worked as "partners" for four years with Pardo securing the client and Cachaldora doing the follow-up work. Although Pardo told Carlos about the alterations, Carlos did not advise Alfert or any other TRI employee of Pardo's actions.

7. At hearing, Pardo stated she did not know who sent the altered contract to FNMA but "believes" it was Carlos. However, Carlos denied mailing the contract to FNMA, and testified he received it in early September. Since the evidence shows that FNMA received the

240

contract prior to September, it is found that Pardo mailed the contract to FNMA in July or August without advising Futrell or respondents.

8. By fortuitous circumstances FNMA happened to receive from Futrell a validly executed contract on the same property at 100 Southwest 110th Avenue. This contract and the altered July 10 contract were sent to the FNMA attorney in Miami for review in preparing the closing documents. When FNMA's attorney began checking the documents, she noted there were some discrepancies in the two contracts and brought this to the attention of FNMA. Thereafter, a FNMA area supervisor in Atlanta, Paul Buechele, compared the July 10 contract with the other contract and noted that the names on the contracts did not match, that the July 10 contract had the initials of a FNMA employee who no longer worked at FNMA, and that he did not have the original July 10 contract in his files. Buechele telephoned Alfert on Friday, September 5 and briefly told him he had a "problem," and followed up with a letter the same day advising that FNMA "(had) no record of this sales contract," and for Alfert to express mail the original within 48 hours or else FNMA would "consider any such contract null and void." Although Buechele suspected the second contract might be an altered document or a forgery, he did not tell this to Alfert. During their conversation, Alfert looked in the office file, but could not find the original contract. He then advised Buechele that he would have to check with the salesman involved with the sale and get back in touch after he learned what had happened. There were no further communications between the two.

9. The following Monday, Alfert met with Cachaldora who told Alfert he thought the original copy had been sent to FNMA and it must have been misplaced. Alfert was not overly concerned since it was not unusual for the selling broker to have only a copy of a contract in its files, particularly since the listing broker is given the original on FNMA transactions. At no time did Carlos advise Alfert that the July 10 contract was an alteration of the June 10 contract. Carlos telephoned Buechele the same day and advised him TRI had a copy, but no original, of the contract, and it was being expressed mailed that day to FNMA in Atlanta.

10. On September 11, 1986, Rouco wrote TRI a letter requesting the immediate return of her $4,000 deposit because she had just been advised she could not qualify for a loan. Alfert mailed her a refund check the same day. He gave no further thought to the matter since he felt the contract at that point was "terminated." This was because Rouco had requested a return of her deposit, and more than forty-eight hours had passed since receiving Buechele's letter.

241

11. On December 2, 1986, a Division investigator visited Alfert to discuss the July 10 contract. His visit was prompted by a complaint from Buechele about the altered contract. For the first time, Alfert learned what Pardo had done. Alfert immediately sent her written notice that she was fired. He also advised the Division that she was no longer an employee of TRI. Cachaldora, who had worked for TRI for some twelve years, also left TRI a few months later, albeit voluntarily. He was not fired because Alfert considered Pardo, and not Cachaldora, to be the guilty party.

12. TRI is a relatively large realty office having three brokers and approximately seventy-five salesmen. Alfert holds the position of manager and has bi-weekly meetings with sales personnel to go over office procedures and to discuss sales. According to office procedure, Alfert is, whenever practicable, supposed to review all contracts before they are presented or mailed. This advice was conveyed to Pardo and Cachaldora but they did not follow office procedure. Except for the activities of Pardo and Cachaldora, there is no evidence that any other employee was involved in the Rouco matter.

## CONCLUSIONS OF LAW

1. The Division of Administrative Hearings has jurisdiction of the subject matter and the parties thereto pursuant to Subsection 120.57(1), Florida Statutes (Supp. 1986).

2. Respondents are both charged with culpable negligence and breach of trust in a business transaction for their activities (or lack thereof) in the Pardo-Cachaldora affair. Since respondents' broker licenses are at risk, petitioner must prove its allegations by clear and convincing evidence. *Ferris v. Turlington,* 510 So.2d 292 (Fla. 1987).

3. Culpable negligence and breach of trust are not defined in Subsection 475.25(1)(b), nor by agency rule. In addition, counsel have not referred the undersigned to prior agency orders which construe these terms. Therefore, reference to other definitional sources is appropriate. In Black's Law Dictionary, Fifth Edition, the term culpable negligence is defined as follows:

> Failure to exercise that degree of care rendered appropriate by the particular circumstances, and which a man of ordinary prudence in the same situation and with equal experience would not have omitted.

Breach of trust is defined in the same source as follows:

> Any act done by a trustee contrary to the terms of his trust, or in excess of his authority and to the detriment of the trust; or the

242

wrongful omission by a trustee of any act required of him by the terms of the trust. Also the wrongful misappropriation by a trustee of any fund or property which had been lawfully committed to him in a fiduciary character. Every violation by a trustee of a duty which equity lays upon him, whether willful and fraudulent, or done through negligence, or arising through mere oversight and forgetfulness, is a "breach of trust." The term, therefore, includes every omission and commission in carrying out the trust according to its terms, of care and diligence in protecting and investing the trust property, and of using perfect good faith. A violation by the trustee of any duty which he owes to the beneficiary.

4. The administrative complaint suggests that respondent Alfert was guilty of culpable negligence by failing to supervise, control and direct the activities of salesmen Pardo and Cachaldora. Presumably, this guilt is then imputed to respondent TRI through the actions (or lack thereof) of Alfert. The evidence discloses that respondent Alfert held bi-weekly meetings with all salesmen to go over office procedures, and that such procedures required all salesmen to submit to him for review, whenever practicable, all offers and contracts leaving the office. Although he was shown a copy of the altered July 10 contract, he had no reason to suspect anything was wrong. Therefore, as to the activities of Pardo at that point, he exercised the same degree of care as would a broker of ordinary prudence in the same situation and with equal experience. After receiving Buechele's telephone call and letter mailed on September 5, Alfert again took steps to learn what Pardo had done, but was told by Cachaldora that the original contract had been forwarded to Atlanta and was probably misplaced. Again, he had no reason to suspect an altered contract since Buechele did not tell him this in either his conversation or letter. After Rouco requested a refund of her deposit, Alfert reasonably assumed there was no longer a valid contract, and no further thought should be given to the matter. When he finally learned of the wrongdoing, Alfert immediately fired Pardo, the guilty party. Given these circumstances, it is concluded that Alfert exercised an appropriate degree of care, and that he is not guilty of culpable negligence. In view of this conclusion, a similar result must be reached as to TRI.

5. The complaint does not tell precisely how a breach of trust on the part of respondents has occurred. The undersigned assumes the agency is alleging a fiduciary relationship between Pardo and Rouco existed, that Pardo, with Cachaldora's assistance, breached this relationship by failing to tell the client that an altered sales offer had been submitted on her behalf to FNMA, and that such a breach is imputed to

**243**

respondents. While a fiduciary relationship between Pardo and Rouco may have existed, any breach of trust can hardly be imputed to the broker when the salesmen took active steps to concel this fact, and the broker exercised reasonable care in scrutinizing their activities. Therefore, the charge that respondents are guilty of breach of trust must fail.

## RECOMMENDATION

Based on the foregoing findings of fact and conclusions of law, it is

RECOMMENDED that respondents be found not guilty of violation Subsection 475.25(1)(b), Florida Statutes (1985), as alleged in the administrative complaint.

DONE AND ORDERED this 7th day of December, 1987, in Tallahassee, Leon County, Florida.